## RED DIAMOND CLOTHING COMPANY, Appellant and Respondent, v. MARY A. STEIDEMANN et al., Respondents and Appellants.

St. Louis Court of Appeals, December 31, 1912.

1. **LANDLORD AND TENANT: Removal of Property Installed by Tenant: Oral Agreement: Fixtures: Trade Fixtures.** An oral agreement between a lessor and a lessee, that property installed in the demised premises shall belong to the lessee and may be removed on the expiration of the lease, is valid and may operate to convert what would otherwise be realty into a personal chattel for the purpose of the case; but such an agreement gives the lessee a right to remove erections of a permanent character not peculiarly parcel of a trade plant only when they are installed by him during the term and can be dissevered without material injury to the reversion.

2. ———: ———: ———: **Fixtures: Trade Fixtures: Conversion by Landlord.** Under an oral agreement between a lessor and a lessee that property installed by the lessee in a building demised for manufacturing purposes should belong to him and that he should have the right to remove it on the expiration of the lease, a boiler, an engine, a steam pump and a blow-off tank installed by him, which were parcel of his manufacturing plant and therefore "trade fixtures," and which could be removed without substantial injury to the building, belonged to and were removable by him, and the refusal of the landlord to allow him to remove them amounted to a conversion.

3. ———: ———: ———: **Fixtures: Trade Fixtures: Conversion by Landlord.** A heating plant and sprinkling apparatus installed by a lessee in a building devoted to manufacturing purposes, which were not parcel of his manufacturing plant and therefore not "trade fixtures," and which were so installed in the building as to preclude their removal without substantial injury to it, were "fixtures," and hence were not removable by the lessee, notwithstanding it had been agreed between him and the lessor that property installed in the building by him should belong to him and that he should have the right to remove it on the expiration of the lease.

4. **FIXTURES: "Trade Fixtures:" What Are.** A boiler, an engine, a steam pump and a blow-off tank installed by a tenant in a building and all parcel of a manufacturing plant there located, were "trade fixtures;" but a heating plant and sprinkling apparatus, installed by the tenant merely to furnish warmth to his workmen and protection against fire, respectively, were not "trade fixtures."

5. **CONVERSION: Landlord and Tenant: Landlord's Conversion of Removable Property: Measure of Damages.** In an action by a tenant against a landlord for conversion of certain trade fixtures belonging to the tenant and removable by him from the demised premises on the expiration of the lease, the measure of damages was the value of the fixtures at the time and place of the conversion, not such value less the cost of removal.

6. **APPELLATE PRACTICE: Review: Refusal to Allow Interest: Necessity of Excepting.** The appellate court will not review the refusal of the trial court to allow plaintiff interest on his recovery, unless such refusal is made a ground of complaint in the motion for a new trial filed by him.

7. **LANDLORD AND TENANT: Removal of Property Installed by Tenant: Oral Agreement: Effect of Entering Into New Lease: Fixtures.** The renewal of a lease without stipulating concerning the removal of fixtures does not operate as an abandonment by the tenant of a then-existing right to remove trade fixtures which are removable without substantial injury to the freehold.

8. ————: ————: ————: ————: **Term "Fixtures" Construed.** A lease provided that, at its termination, the tenant should deliver possession of the premises to the lessor, "with all keys, locks, bolts, window fastenings, *all fixtures*, and window glass replaced, if broken, in as good order as the same are now." *Held*, that the term "all fixtures," construed with reference to the rule *ejusdem generis*, should be held to mean, conformably to its usual meaning, only such things as were parcel of the realty, and hence trade fixtures, which, by an agreement between the parties antedating the lease, the tenant was given the right to remove, and which could be removed without injury to the reversion, were not affected by nor within it.

9. **APPELLATE PRACTICE: Rules of Decision: Admission of Evidence: Harmless Error.** Where it is obvious that, in making the award, a referee considered only competent and material evidence, the erroneous admission of evidence by him will be held to be innocuous, and will not work a reversal, in view of the provisions of sections 1850 and 2082, Revised Statutes 1909.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench,* Judge.

REVERSED AND REMANDED.

*Wm. R. Orthwein, P. H. Cullen, Thomas T. Fauntleroy* and *Shepard Barclay* for plaintiff (appellant and respondent).

(1) The declarations and statements of an agent (who himself in this case was also one of the joint owners of the property with the others for whom he is acting) are binding upon all jointly interested with him and for whom he is acting at the time as agent. Garnhart v. Finney, 40 Mo. 462; Brooks v. Jameson, 55 Mo. 505; Robinson v. Walton, 58 Mo. 380; Beardslee v. Steinmesch, 38 Mo. 168. (2) A landlord's refusal to permit a tenant to remove property which has been placed by the tenant upon demised premises, and which is removable in the circumstances, amounts to a conversion of the property in question. Neiswanger v. Squier, 73 Mo. 192; Bircher v. Parker, 43 Mo. 443. (3) After the term expires, the landlord may not appropriate the property of tenant where circumstances demonstrate no intent to surrender or abandon the property. The "circumstances" are found in the record history of the first suit between these parties (120 Mo. App. 519) the interviews and other actions of the parties. Finney v. City, 37 Mo. 177; Neiswanger v. Squier, 73 Mo. 198. (4) Property such as the sprinkling apparatus in this case, and similar articles in controversy here, were removable by the tenants both by mutual agreement with the landlords and by reason of their character. Articles which when installed are agreed between landlord and tenant to be removable may be so removed, whether meanwhile they be properly considered chattel property or part of the realty. Here, the most positive agreements and

assurances as to their removability were made. Kuhl-
man v. Meier, 7 Mo. App. 263; Ferry Co. v. Railroad,
142 U. S. 415; Goodman v. Railroad, 45 Mo. 34.    (5)
The items of property in question here were agreed to
be removable, and a sale by the first tenant was made
to another tenant on the faith of representations by
the landlords' agent (himself also a joint landlord)
that they were the property of the tenant.  It would
be inequitable to permit the landlords now to set up a
different claim.  There is an estoppel created by the
facts against their claim of title, which, by the way,
is not set up expressly in their answer which is a gen-
eral denial.  The facts in evidence are a firm estoppel
against their present argument.  Garnhart v. Finney,
40 Mo. 462; Chouteau v. Goddin, 39 Mo. 229; Priestly
v. Johnson, 67 Mo. 636.  The question of removability
of such property is determined by the intent of the par-
ties (landlord and tenant) and when clearly expressed
will be enforced by the courts.  Mrs. Steidemann had
no idea of claiming this property till 1904.  Graves v.
Pierce, 53 Mo. 423; Cook v. McNeil, 49 Mo. App. 84;
Brown v. Baldwin, 121 Mo. 126.  If there is an agree-
ment that tenant may remove the property, the fact
that some injury to the freehold may be thereby caused
is no objection.  Kuhlmann v. Meier, 7 Mo. App. 263,
9 Mo. App. 595.  Different rules apply in regard to
removing such articles as between vendor and vendee,
mortgagor and mortgagee and those applicable to land-
lord and tenant.  The rules as to the latter are more
liberal to the tenant.  Rogers v. Crow, 40 Mo. 93;
Fox v. Lynch, 64 Atl. 439.  (6)  The fact that the old
lease ended, and a new agreement or renewal occur-
red, does not transfer title of tenant's separate per-
sonalty to the landlord.  The circumstance that the
rent under second lease was $700 less than under the
first is a clear index to the intent of the parties regard-
ing ownership of the property in controversy.  Keer
v. Kingsbury, 39 Mich. 150; Finney v. City, 39 Mo.

177; Neiswanger v. Squier, 73 Mo. 192; Walker v. Seymour, 13 Mo. 590. The word "fixtures," in the second lease, is to be interpreted by the circumstances and by applying the rules *noscitur a sociis* and *ejusdem generis* to ascertain what was the intent of the parties to the lease by that word. It was evidently used to mean minor articles like those in the context, and not those now in question. Cullen v. Butler, 5 M. & S. 461; McNichol v. Agency, 74 Mo. 463; Railroad v. Bank, 92 Va. 496, 44 L. R. A. 458; Nesbitt v. Lushington, 4 T. R. 783. (7) The foregoing rules are decisive but they are reenforced by the nature of the items here in question, as obviously trade appurtenances of the factory, and a liberal rule as to removability applies to such trade articles as between landlord and tenant. Ferry Co. v. Railroad, 145 U. S. 415; Hines v. Ament, 43 Mo. 300; Hobson v. Gorringe, 1 Ch. 182. (8) The word "fixtures" in the last lease means only articles which are permanent parts of the realty. It is not a word which would divest title of the tenant to personal property on the premises and vest same in the landlord. Cubbins v. Ayres, 4 Lea (Tenn.), 359; Brown v. Baldwin, 121 Mo. 134; (9) The measure of damages for conversion of such property which was not in fact severed, but remained in place and was so appropriated by the landlord, is not the "junk" value thereof (as if it had been severed) but its value in its place and for the purposes of its legitimate use. Neiswanger v. Squier, 73 Mo. 192. (10) The general rule is applicable here that the damages for conversion are ascertained by the value as of the time and place of the conversion, not as of some other time or some imaginary place, as assumed in the finding herein as to damages, in the trial court. Neiswanger v. Squier, 73 Mo. 192; Skeen v. Co., 42 Mo. App. 158. (11) The claim in the petition for damages for conversion and appropriation of this property of plaintiff by the defendants is for $3500, far in excess of the finding of

the learned referee and court below. Interest is a proper item of recovery to be allowed as part of the damages in such a case. The award, findings and judgment were inadequate in that particular. R. S. 1909, sec. 5430; Carson v. Smith, 133 Mo. 606. This statute makes erroneous the court's ruling disallowing finding of referee for interest on the value of the property found to have been converted. Lack v. Brecht, 166 Mo. 242; Watson v. Harman, 85 Mo. 442; Carson v. Smith, 133 Mo. 606.

*George W. Lubke* and *George W. Lubke, Jr.* for defendants (appellants and respondents).

(1) The engine, boiler, blow-off tank, steam pump, pipes, radiators and other appliances which comprised the heating and power apparatus were all a part of the building as planned, put up and leased for manufacturing purposes. They were fixtures within the full legal meaning of that term. Goodin v. Association, 5 Mo. App. 293; Manufacturing Co. v. Carroll, 72 Mo. App. 315; Electric Supply Co. v. Electric L. & P. Co., 75 Mo. App. 622; Davis v. Mugan, 56 Mo. App. 311; Donnewald v. Real Estate Co., 44 Mo. App. 350; Thomas v. Davis, 76 Mo. 72; Cohen v. Kyler, 27 Mo. 122; Havens v. Fire Ins. Co., 123 Mo. 430; Machine Co. v. Brick & Quarry Co., 151 Mo. 501; Green v. Phillips, 26 Grat. (Va.) 752; Hart v. Sheldon, 34 Hun (N. Y.), 38; Friedley v. Gildings, 119 Fed. 438; Langdon v. Buchanan, 62 N. H. 657; Harlan v. Harlan, 15 Pa. 507; Field v. Bank, 148 Ill. 163; Deal v. Palmore, 72 N. C. 582; McRae v. Bank, 66 N. Y. 489; Bank v. Adams, 138 Ill. 483; Williams' App., 16 Atl. (Pa.) 810; Pea v. Pea, 35 Ind. 387; Hutchinson v. Masterson, 46 Tex. 551; Potter v. Cromwell, 40 N. Y. 287; Wadligh v. Jamvrin, 41 N. H. 503; Bryan v. Lawrence, 50 N. C. 337; Bank v. Emerson, 15 Mass. 159; Oves v. Oglesby, 7 Watts (Pa.), 106;

Dispatch Line v. Belamy Mfg. Co., 12 N. H. 205; Lophan v. Norton, 71 Me. 83; Toeles v. Winton, 63 Conn. 440; Horne v. Smith, 105 N. C. 322; Fryatt v. Sulivan Co., 5 Hill (N. Y.), 116; Sands v. Pfeiffer, 10 Cal. 260; Winslow v. Merchants Ins. Co., 4 Met. (Mass.) 306; Harkness v. Sears, 26 Ala. 493; Gary v. Burguieres, 12 La. Ann. 227; McRae v. Bank, 66 N. Y. 490; Tabor v. Robinson, 36 Barb. 485; Reynolds v. Ashby & Son, Vol. 73, Law Journal, 1904 Reports, King's Bench Division, p. 946. . (2)   The Red Diamond Clothing Company as assignee of the lease given by defendants, Mrs. Steidemann and Mrs. Zacher, and the deceased, Julius Steidemann, to the Wright & Green Manufacturing Company in 1899 took no greater rights than were held by the latter company. And the Wright & Green Manufacturing Company having taken that new lease without reserving any right to the articles comprising the heating and power plant except the right to use them as part of the leased premises lost all right to remove them at the expiration of the new lease, particularly since by the new lease they also expressly covenanted to surrender all fixtures to the lessors at the end of the term.   2 Tiffany on Landlord and Tenant, 1593-1594g; Williams v. Lane, 62 Mo. App. 66; Real Estate Co. v. Schuchman Co., 103 Mo. App. 24; Langham v. Ross, 45 N. Y. 792; Davis v. Moss, 38 Pa. St. 346; Donnewald v. Real Estate Co., 44 Mo. App. 350.   (3)   The admission by the referee of the irrelevant and incompetent testimony as bearing on the value of the property at various times in its history was error and its admission was prejudicial to the defendants.   Street Railway v. Walsh, 197 Mo. 392.

STATEMENT.—These are cross-appeals.   The suit is in conversion for the value of a lot of fixtures.   The finding and judgment were for plaintiff and defendants prosecute an appeal therefrom on the theory that

the property found to have been converted belonged to them because of annexation to the freehold; while plaintiff prosecutes an appeal from the same judgment for the reason it is dissatisfied with the amount of the recovery. The case was referred by the circuit court to Charles P. Williams, Esquire, a member of the bar of the city of St. Louis, who, after having heard the evidence, in due time reported his findings of fact and conclusions of law thereon. The referee's report reveals a careful and thoughtful consideration of the case and sets out the facts and conclusions so clearly as to warrant us in copying it in full. For a complete statement of the case, we set forth the referee's report as follows:

"In May, 1889, E. H. Kortkamp, Julius Steidemann, Mary A. Steidemann, O. H. Kortkamp, Anna Kortkamp, Matilda Giessler, William J. Giessler, Emilia Zacher and August Zacher owned a lot of ground in city block 168 in the city of St. Louis, containing a front of forty-seven feet on the west line of Eighth street by a depth westwardly of 132 feet, six inches, bounded on the north by a line seventy-one feet, six inches distant from the south line of Franklin avenue. This 47-foot lot was made up of two parcels of ground which may be designated as the Kortkamp parcel and the Steidemann parcel.

"On the day aforesaid all the foregoing parties joined in executing a lease of the aforesaid forty-seven feet to the Milius Boot & Shoe Manufacturing Company, the lessors further agreeing in said lease to erect a factory building covering the whole forty-seven feet for the use of the lessee. The lease was for a term of ten years with an annual rental of $2200, payable in monthly installmnts, and the lessee covenanted to pay the taxes, which amounted to some four hundred dollars per annum. There was apparently some arrangement as to the rental which caused it to be fixed with relation to the estimated cost of the

building. Shortly before the building was completed, Mr. Milius, the president of the lessee company, had a talk with Mr. Julius Steidemann, one of the owners, in which Mr. Steidemann stated that he was acting as the agent of the parties interested in the building; that those parties would object to putting up anything in the building except the building proper and the elevators; and, as long as the lessee company had its own boiler, engine and heating plant at its former place of manufacture, that, if the lessee desired, it could move its own plant to the new premises, and as the owners did not desire to go to this expense, they would not charge it as a part of the construction. In accordance with this arrangement, the lessee company installed in the building its boiler, engine, heating apparatus, steam pump and blow-off tank. The blow-off tank was used to receive the waste steam from the engine and boiler and was required to be used in connection therewith by the city ordinance. The steam pump appears to have been used in connection with the boiler and with the water supply in the sprinkling tank and pipes.

"Some time later, the lessee brought up the question of installing a sprinkling equipment in the building and discussed the matter with Mr. Julius Steidemann. Mr. Steidemann objected to putting the sprinkling equipment in and Mr. Milius then inquired whether he would be willing to contribute any portion toward the cost of it. Mr. Steidemann at first objected and said he did not care to go to the expense. Mr. Milius then argued with him on the proposition of insurance, but Steidemann stated that he was insured in a mutual company anyway. He then stated that if the balance of the folks did not object he would see them and might possibly get some contribution toward it for the lessee. In a later interview between the parties, Steidemann agreed to pay $250 toward the expense of installing the sprinkling apparatus, stating that he didn't care about it and that at any time

the lessee desired to move it or any part of the plant they could do so. There was no substantial evidence that this $250 was contributed to by any of the other lessors except Julius Steidemann. Thereafter the sprinkling plant was put into the building by the lessee company.

"About a year and a half before the termination of the tenancy under the first lease, Mr. Milius endeavored to sell the articles in controversy to Mr. Julius Steidemann, stating to him that they would be worth a great deal more to him or to any new tenant that was to occupy the building, but Steidemann refused to buy them, stating that he didn't care about investing any money in them, that the lessee could take them or leave them just as he pleased.

"A few months after the above-detailed occurrence, the Milius Boot & Shoe Manufacturing Company sold the articles in controversy to the Wright & Greene Manufacturing Company for the sum of $800. Prior to this sale, Mr. Greene of the Wright & Greene Manufacturing Company came to see Mr. Julius Steidemann about the purchase of the plant. Mr. Steidemann stated to Mr. Greene that they had no title to the property in the building, to the machinery, etc., and that the Wright & Greene Company could buy this property without any danger from the owners. Acting upon these statements, Wright & Greene bought the property in controversy.

"About the same time, Wright & Greene bought the unexpired portion of the Milius lease, and secured a new lease of the premises from Mary A. Steidemann, Emilia Zacher and Julius Steidemann, the then owners, which lease is in word and figures as follows, to-wit:

" 'This lease, made and entered into this 31st day of July, 1899, by and between Mary A. Steidemann, Emilia Zacher and Julius Steidemann, hereinafter referred to as the lessors, and the Wright & Greene

Manufacturing Company, hereinafter referred to as lessee:

" 'Witnesseth, That said lessors for and in consideration of the rent to be paid, and the covenants and stipulations hereinafter mentioned, to be kept by said lessee, its executors, administrators, successors and assigns, do hereby lease unto the said lessee the following described premises, situated in the city of St. Louis, State of Missouri, to-wit, the four-story and basement brick building known and numbered eight hundred and twenty-five (825) and eight hundred and twenty-seven (827) North Eighth street.

" 'To have and enjoy the same, subject to the conditions herein contained for the purpose of manufacturing shirts, overalls, duck goods, etc., and shall not be used by said lessee, or any person occupying the same, in any manner or for any purpose prohibited by any law or ordinance or by the terms hereof for and during the term of five years commencing on the first day of January, 1900, and ending on the thirty-first day of December, 1904. Said lessee, and all claiming under it by virtue of the provisions of this lease, paying a rental therefor to the said lessors or their legal representatives, of nine thousand, five hundred (9500) dollars, for the full term of this lease, and to pay the same monthly in advance, in installments of one hundred and fifty-eight and one-third dollars per month in lawful money of the United States on the first day of each month during the continuance of this lease.

" 'Said lessee will not assign or sublet the whole or any part of said premises, without the written consent of lessors, any consent by lessors to any assignment, or subletting of said premises or any part thereof, shall not be held to release the lessee from a fulfillment on its part with the conditions or covenants held against it. All repairs or alterations deemed necessary by lessee to be made by lessee at its own

expense, with consent of lessors, and all repairs or alterations so made to remain on the premises without cost to lessors.

" 'Said lessee and all holding under it agree to use reasonable diligence in the care and protection of said premises during the term of this lease; to pay water license assessed against property, to keep water pipes and plumbing in order, and to pay all loss or damage done to premises unless beyond its control or power to prevent.

" 'It is understood that said premises are to be kept free from all nuisances whether of privy, yard, cellar, or sewer, at the expense of said lessee.

" 'The lessee obligates itself to keep the premises at all times free from the accumulation of ashes, trash or other rubbish.

" 'It is further understood and agreed by said lessee that in the event of any increase in rate of insurance on said premises caused by lessee occupancy, that said lessee will pay to lessor upon demand the amount of said increase.

" 'The lessee agrees to permit the lessors or their agents to inspect the premises hereby leased at any time during business hours, so as to determine if all provisions of this lease are being complied with by said lessee, and also for the purpose of allowing said lessor or their agent to do any work said lessors may deem necessary for the protection of the property leased.

" 'Failure on the part of lessee to comply with the provisions of this lease to work a forfeiture of same at option of lessors, and in case of any forfeiture of this lease the said lessors or their assigns shall be entitled and may take possession of said demised premises.

" 'Said lessee will quit and deliver up the possession of said premises to lessors, their heirs or assigns, when this lease terminates by limitation or for-

feiture, with all keys, locks, bolts, window fastenings, all fixtures, and window glass replaced, if broken, in as good order and condition as the same are now, or may hereafter be made by repair, save only the wear thereof from reasonable and careful use.

" 'The destruction of said building or premises by fire or the elements, or such material injury thereto as to render said premises unquestionably untenantable for thirty days shall at the option of said lessors or lessee produce and work a termination of this lease.

" 'If the lessors and lessee cannot agree as to whether said building is unquestionably untenantable for thirty days, the fact shall be determined by arbitration; the lessors and lessee each to choose an arbitrator, and if the two thus chosen cannot agree, they shall select a third, and the decision of any two such arbitrators shall be conclusive and binding upon both parties hereto.

" 'If it is determined by arbitration or agreement between lessors and lessee that said building is not unquestionably untenantable for thirty days, then said lessors must restore said building at their expense, with all reasonable speed and promptness, and in such a case a just and proportionate part of said rental shall be abated until said premises have been duly restored.

" 'In testimony whereof, the parties have set their hands and seals to duplicate leases, the day and year first above written.

> JULIUS STEIDEMANN,
> MARY A. STEIDEMANN,
> EMILIA ZACHER,
> WRIGHT & GREENE MANFG. CO.
> S. H. WRIGHT,
> JNO. GREENE.'

"The Wright & Greene Manufacturing Company subsequently changed its name to the Wright, Greene & Wilkinson Manufacturing Company. It was en-

gaged in light clothing manufacturing. During the term of the second lease, in June, 1902, with the written consent of the lessors, Wright, Greene & Wilkinson Company transferred the unexpired portion of their leasehold to J. H. Wedemeyer, his heirs and assigns. Wedemeyer was a member of a partnership composed of himself and Thomas A. Armistead, doing business under the firm name and style of the Red Diamond Clothing Company. The property in controversy, together with shafting, belting, sewing machines and other machinery used by Wright, Greene & Wilkinson, was also purchased by Wedemeyer at the same time for his firm. Almost immediately thereafter, the partnership incorporated under the laws of Missouri as the Red Diamond Clothing Company, and continued as such in the occupancy of the premises in question until the termination of the lease. Beginning with the period of its occupancy, the Red Diamond Clothing Company paid the rental in its own name to the agents of the lessors, with the knowledge and acquiescence of the lessors.

"In the summer or fall of 1904, several months prior to the expiration of the term, the Red Diamond Clothing Company entered into negotiations with the J. H. Buettner Furniture Company with the view of selling to said company the property in controversy. The negotiations progressed to a point where the parties had agreed tentatively upon the price of $1500 for the sale of the boiler, engine, steam pump, blow-off tank, heating apparatus and sprinkler equipment. The consummation of the sale was, however, to be contingent upon the ability of the Buettner Company to secure a satisfactory lease from the landlords of the property. Before the consummation of this, Buettner was informed that the landlords claimed to own the property in controversy and the proposed sale fell through. Thereupon Mr. Armistead, representing the Red Diamond Clothing Company, called to see Mrs.

Mary A. Steidemann and asserted to her the title of his company to the property in question.

"The referee finds as a fact that in the course of that conversation Mrs. Steidemann stated to Mr. Armistead that this property had been put into the building by the former lessee of the premises; that she had been informed by Mr. Hyke, in the real estate department of the Mercantile Trust Company, that she was entitled to claim it under her lease and that she proposed to do so. About this time, Judge George W. Lubke, representing the landlords, notified the Red Diamond Clothing Company not to remove or sell said property as it belonged to the owners. A somewhat spirited correspondence ensued between attorneys for plaintiffs and defendants, in which the ownership of this property was mutually claimed and mutually denied. Thereafter, in order to determine the title to the property, a suit in equity was brought by the plaintiff, which was finally dismissed by the St. Louis Court of Appeals as having been prematurely brought. In December, 1904, the Red Diamond Clothing Company removed from the premises, taking with it a large quantity of machinery employed by it in its business of manufacturing shirts, overalls, etc., consisting of sewing machines, belting, shafting, gearing and other machinery, purchased by them with the property in controversy. The property in question was not removed.

"After the removal of the Red Diamond Clothing Company from the premises, the owners of the property expended considerable money in the repair of the heating and sprinkling apparatus, and executed a lease of the building, together with these articles in controversy, to the Buettner Furniture Company, which is still in the tenancy thereof. Thereafter this action for a conversion was brought.

"The referee declares that if the property in controversy was of such a character as to entitle the plain-

tiff to remove it, then the acts of the defendants, Mary
A. Steidemann and Emilia Zacher, constituted a con-
version of such property. No conversion can be predi-
cated under the evidence as against Julius Steide-
mann, for the reason that Julius Steidemann, in June,
1904, prior to the controversy, transferred all his in-
terests in the property to Mrs. Mary Steidemann, and
subsequently had nothing to do with the management
of the property.

"The property in question is a boiler, steam en-
gine, blow-off tank, steam pump, heating pipes and
radiators and sprinkling apparatus. All these were in-
stalled by the Milius Company during the period of
their tenancy under the circumstances described be-
fore.

"The engine was about a thirty-five horse power
steam engine, situated in an engine house somewhat
less than one story in height, built of brick and an-
nexed to the west end of the main building. It rested
upon a concrete foundation, but there is no satisfac-
tory evidence in the record as to the manner of its
fastening. It was used to operate the steam pump and
the machinery used in the manufacturing premises by
means of belting and shafting. It was connected with
the boiler in the ordinary manner by steam pipe. At
the time of the termination of the second lease, it was
about eighteen to twenty years old, and apparently,
considering its age, in fair operative condition.

"The boiler extended partly into the main build-
ing and partly into the engine house. The north wall
of the building served to enclose it on one side and on
the other side it was bricked around to the top of the
boiler. It was connected to the engine with pipes and
with the supply pipes of the heating apparatus. A
pipe led also to the blow-off tank for the discharge of
surplus steam. It does not appear from the evidence

that the brick work around the boiler was interlaced with the brick work of the building.

"The steam pump and blow-off tank apparently stood upon the concrete floor of the engine house, which was substantially on a level with the basement of the main building. The referee finds as a matter of fact that the boiler, engine, steam pump, and blow-off tank could have been removed without any substantial injury to the building.

"The heating apparatus consisted of supply pipes connecting with the boiler and running through the walls and floors to the radiators and steam coils (some thirty or thirty-five in number), situated in various parts of the building. I find that the radiators and steam coils could have been detached from their connections with the supply pipes at inconsiderable cost and without material injury to the building, but would have been of very small value when removed. The steam supply pipes could have been removed from the building, but would leave holes in the floors and walls that would have to be repaired. The cost of removing steam supply pipes would have been equal to or greater than their value when removed.

"The sprinkling apparatus consisted of a 5000-gallon wooden tank, which stood on a raised platform eight or ten feet above the roof of the building. The platform is erected upon timbers laid across the fire walls of the building. The tank was kept supplied with water by a four-inch pipe connecting with the city water main in the street. From the tank through the various walls and ceilings of the building supply pipes ran furnished with sprinkler heads composed of fusible metal. The tank and pipes connecting therewith could have been removed from the building leaving holes in the walls and ceilings which would have to be repaired and the value of the tank and sprinkling aparatus would have been simply as junk, the value of

which would have been less than or at any rate equal to the cost of removal.

"The referee further finds that the reasonable value of the boiler, the steam pump, the blow-off tank and the heating pipes, radiators and coils, when considered as affixed to the building, was $730. The referee further finds that the value of the engine at the time of the alleged conversion was about $225, considered as placed within the building.

"The referee finds that the value of the sprinkling plant considered as forming a part of the building and installed therein was about $1500.

"The referee further finds that the value of the engine, boiler, blow-off tank and steam pump, less the cost of their removal from the building at the time of the alleged conversion, was $377.50.

"The referee finds that the boiler could not have been used in connection with the existing heating apparatus alone, and that it would be necessary to install new or change the old heating apparatus in order to use the bolier therewith alone.

"The referee further finds the fact to be that up to about the time of the execution of the second lease, Julius Steidemann was in the general charge of the premises in question, and acted for the other owners in the active management thereof, apparently, however, consulting with them on certain matters, for instance, as to contribution toward sprinklers.

"The referee further finds the fact to be that the second lease was arranged for by Mrs. Mary Steidemann acting for herself and the other owners in conjunction with the Mercantile Trust Company.

"There is no satisfactory evidence that any conversation was had between any of the parties with reference to the character of the property in controversy or its removability that was not prior to, or at least substantially contemporaneous with, the execu-

tion of the second lease set forth before, until the arrival of this controversy.

"At the time of the alleged conversion, Mary A. Steidemann and Emilia Zacher were the owners of the property, and if any conversion exists it must be charged against them.

"Julius Steidemann sold all his interest in this property in the early part of June, 1904 to Mrs. Mary Steidemann. He died some time after this controversy arose and no evidence for him is obtainable.

## "II.

## "CONCLUSIONS.

"The engine, boiler, blow-off tank and steam pump constituted personalty as between the parties, and were not fixtures, in the sense in which that term is used in the second lease. They were distinct articles, readily usable elsewhere, and formed apparently a necessary part of the manufacturing plant. The burden in this State is on the landlord to show that property in its nature personal, and put into the building for the better enjoyment of it, has become realty or appurtenant thereto. I do not find that such burden in this case has been fairly sustained. The boiler could not be used in connection with the existing heating plant alone, without extensive changes. There is little testimony to show substantial or intentionally permanent annexation of the engine, blow-off tank and steam pump.

## "III.

"The heating pipes, radiators, coils, sprinkling tank, pipes and heads, on the other hand, form no proper part of the manufacturing plant. Their value when removed is as second-hand material or junk, and the cost of removal would be substantially equal to or

greater than their value when removed. They were added to the building for the better enjoyment of the building as such. In my judgment, they constitute fixtures, in the sense in which that term is used in the second lease. There can be no conversion predicated upon their retention.

## "IV.

"The measure of damages in conversion, where no punitive damages are sought, is, as I understand it, the market value of the goods converted at the time of conversion. The claimants have no right in this form of action to recover substantial damages based upon the peculiar value of the articles, as placed permanently in a building belonging to some one else.

"The measure of damages in this case must be the market value of the removable property, when removed from the building.

"The cost of removal must be taken into consideration. Otherwise, it seemed to me we should abandon the doctrine of avoidable damages. Presumably the claimants should have bought other second-hand property of equal value at the market price.

## "V.

"I understand the rule of law to be that all prior and contemporaneous bargainings and arrangements are considered as merged in the written lease. Where the language is ambiguous or doubtful, resort may be had to all surrounding circumstances. If I were clear that, under the facts and circumstances, the engine, boiler, pump and blow-off tank constituted fixtures, then, under the language of the second lease, as well as under the general rules of law, I should necessarily be compelled to hold that there was an abandonment and surrender of them to the landlords.

"The difficulty is, that what constitutes a fixture is largely a question of fact. This question of fact

depends upon the nature and situation of the property and the intention of the parties. Upon concrete cases the decisions are in hopeless and irreconcilable conflict. I have devoted much time to their consideration, going far beyond the briefs of counsel.

"I agree that parol understanding between the parties, where it amounts to contract or estoppel, can change personalty to fixtures or fixtures to personalty. I do not find that Julius Steidemann was ever actually or impliedly authorized by his statements to bargain away the right of the other co-owners, and waive for them their right to claim property annexed to the realty. Julius Stediemann, not being proven to have such power to bind his co-owners, could not by his sole act, as for himself alone, convert the nature of this property. He could no more do it than one joint owner can grant an easement in the common land.

"Futhermore, Julius Steidemann never went far enough to say, that notwithstanding the terms of any lease which you may make and notwithstanding you may leave this property until your current term is ended, you may still remove it.

"For these reasons I am of the opinion that the heating pipes and the sprinkling plant have not been converted by agreement of the parties into pure personalty.

"I find against the defendants, Emilia Zacher and Mary A. Steidemann, in the sum of $377.50, as for a conversion of the boiler, engine, pump and blow-off tank on the 31st day of December, 1904, with interest from that date. I find in favor of the personal representatives of Julius Steidemann."

Both plaintiff and defendants filed exceptions to the referee's report, but these were in the main overruled by the court. However, one of defendants' exceptions was sustained, in that the court denied plaintiff interest on the amount of the recovery recommended by the referee, for the reason interest thereon

was not prayed for in terms in the petition. After rejecting the recommendation as to such interest, the court entered judgment for $377.50, in accordance with the referee's recommendation, against defendants Emilia Zacher and Mary A. Steidemann, and gave judgment for the estate of Julius Steidemann, deceased.

NORTONI, J. (after stating the facts).—On plaintiff's appeal, it is argued that both the court and the referee erred in the conclusion that any portion of the property here involved became that of defendants' because of the new lease. It is said that all of it was installed in the building by the Milius Company under an agreement with defendants through their agent, Mr. Julius Steidemann, to the effect that it should continue to belong to the tenant and might be removed on the expiration of the lease. There can be no doubt that such was the agreement. The referee so found the fact to be and the evidence reveals it beyond question. Such agreements between landlord and tenant are valid and frequently operate to convert what would otherwise be realty into a personal chattel for the purposes of the case, as the authorities universally declare; for instance, as in the case of a building which may be removed without injury to the freehold. [See Neiswanger v. Squier, 73 Mo. 192; Kuhlmann v. Meier, 7 Mo. App. 260; 13 Am. & Eng. Ency. Law (2 Ed.) 655, 622, 623.] However, these contracts are so construed in this State as to vouchsafe only the right to remove such erections of a permanent character not peculiarly parcel of a trade plant as are installed by the tenant during the term and which may be dissevered without material injury to the property of the landlord. [See Powell v. McAshan, 28 Mo. 70; Kuhlmann v. Meier, 7 Mo. App. 250.]

When the agreement is considered under this rule, it appears that it is available to plaintiff and affords

a right of removal only as to the boiler, engine, steam pump and blow-off tank, for, according to the finding of the referee, these alone could be removed without substantial injury to the building. Furthermore,. these were peculiarly trade fixtures, in that they were parcel of plaintiff's manufacturing plant. But this is not true of the heating plant, consisting of pipes communicating steam to the radiators; neither is it true of the sprinkling apparatus installed in the building. It is true both the heating plant and sprinkling apparatus were conveniences installed for the beneficial use of the property, but they constituted no part of the plaintiff's manufacturing plant. They do not fall within the category of trade fixtures, for the reason the one served no other purpose than that of comfort in providing warmth to the workmen and the other that of protection to the property as against fires. According to the finding of the referee, and the evidence amply supports it, both the heating plant and the sprinkling apparatus were so installed as to preclude their removal without substantial injury to the landlord's building. It is unnecessary to point out the facts touching this matter, as the referee's report is explicit thereon. Because of this, the heating plant and sprinkling apparatus became fixtures, or part of the realty, notwithstanding the agreement, according to the rule of construction above pointed out pertaining to such contracts. If the heating plant and sprinkling apparatus, which were no part of the tenant's plant as such, could not be removed without material or substantial injury to the landlord's property, as the referee finds the fact to be, then the agreement in the first instance availed plaintiff nothing on that score, as decided in Powell v. McAshan, supra, and the tenant must be regarded as having waived the benefits of that agreement with respect to them through the manner of installing these appliances in the premises.

The referee found the value of the engine, boiler, blow-off tank and steam pump, all parcel of the tenant's plant, less their cost of removal from the building at the time of the conversion, at $377.50, and allowed interest thereon. On a review, the court disallowed the item of interest, for the reason plaintiff had not in express terms prayed for interest in his petition, but gave judgment for the amount of $377.50. It is argued that the measure of damage thus applied is an erroneous one, for the reason that, in trover as for conversion, the measure of recovery is the value of the property at the time and place of the conversion. Obviously the proposition is sound. Though it appears defendants forbade plaintiff from removing these items of property which were a part of its plant, and retained them in the building, the referee and the court, in determining the amount of plaintiff's damage, deducted the cost of removal, and treated the property as situate outside of the building thereafter as junk. It would seem that this rule of damages on the facts disclosed allows to defendants benefits accruing from their own wrong. This impinges the rule that a wrongdoer will not be permitted to advantage himself by his own wrongful act. Obviously defendants should not be allowed to convert this property, remodel it as they did, and let it to another tenant in the building, without compensating the owner for the value at the time and place of the conversion. The proposition has been squarely decided by the Supreme Court, as will appear by reference to Neiswanger v. Squier, 73 Mo. 192.

Plaintiff made no complaint in its motion for a new trial touching the ruling of the court on its right to recover interest, and for that reason the matter will not be considered here.

On defendants' appeal, it is argued that, though the several items of property involved were installed in the building originally under an agreement

that the tenant might remove the same, the entire became the property of defendants through the operation of law, by the then owner entering into the new lease, of date July 31, 1899, without expressly reserving in such lease the right of removal. There can be no doubt that the renewal of a lease without any stipulation as to the removal of fixtures on the premises has been generally held to be an abandonment by the tenant of his right of removal. However, the authorities in this country are not entirely in accord on this proposition. [13 Am. & Eng. Ency. Law (2 Ed.) 651; 2 Tiffany, Landlord & Tenant 1593, 1594.] The rule seems to be a harsh one and the most enlightened courts have receded from it in a measure, now and then, until it is somewhat modified in its application under modern conditions. Judge Cooley examined it on principle and repudiated the doctrine entirely, as did the court of which he was a member. [See Kerr v. Kingsbury, 39 Mich. 150.] This court has heretofore declared the full measure of the doctrine with all its attendant rigors. [See Williams v. Lane, 62 Mo. App. 66.] More recently the court has treated it as an established rule of decision with us, as will appear by reference to Champ Spring Co. v. B. Roth Tool Co., 103 Mo. App. 103, 77 S. W. 344; St. Louis v. Nelson, 108 Mo. App. 210, 83 S. W. 270.

But in this jurisdiction, the case of Williams v. Lane, 62 Mo. App. 66, alone asserts the doctrine against the right of removal of mere trade fixtures which are peculiarly a portion of the plant of the tenant. In that case, it was declared that, through entering into a new lease for the premises without reserving the right of removal, the tenant abandoned such trade fixtures as his shelving in the store. The court followed Loughran v. Ross, 45 N. Y. 792, 6 Am. Rep. 173. In a more recent case, Lewis v. Ocean Nav., etc. Co., 125 N. Y. 341, the Court of Appeals of New York, through Justice Peckham, criticized the earlier de-

cision as follows: "The decision in that case was placed upon quite technical reasoning, supported, it is true, by some authorities, but it is not one of those cases whose principle should be extended." In a still more recent case in New York, the appellate division of the Supreme Court considered the authorities and declared that the rule of the Loughran case should apply only to such fixtures as are distinctively realty, which may not be removed without substantial injury to the property. The opinion says, too, "We think the Loughran case should further be limited, and that it should be deemed not applicable to trade fixtures not distinctively realty, designed to retain their character as personal property and capable of removal without material injury to the freehold." [See Bernheimer v. Adams, 70 App. Div. (N. Y.) 114, 123, 124.] The judgment in that case was affirmed by unanimous decision of the Court of Appeals May 19, 1903, without an opinion, however. [See 175 N. Y. 472, 67 N. E. 1080.]

The same question came before the United States Circuit Court of Appeals for the second circuit in Bergh v. Herring-Hall-Martin Safe Co., 136 Fed. Rep. 368. The property involved in that case resembled that involved here very much. The court, in an opinion prepared by Judge Coxe, considered the authorities and approved the distinction declared by the New York courts in Bernheimer v. Adams, supra, saying: "With this distinction observed, no injustice can be done." Furthermore, in considering the doctrine that a new lease without a reservation on the part of the tenant of the right to remove fixtures operates as an abandonment of those he had installed, Mr. Tiffany says as follows: "Since this doctrine is based upon the theory that the new lease includes the fixtures, as constituting a part of the realty, it necessarily follows that it has no application to articles not so annexed, or

not of such character, as to constitute fixtures." [See 2 Tiffany, Landlord & Tenant, 1594.]

In view of the modern tendency to relax the operation of this severe rule in the law of landlord and tenant, it would seem that the principles of natural justice alone forbade its application to these items of property, such as the engine, boiler, steam pump and blow-off tank, which were essentially trade fixtures and part of the tenant's plant. It ought not to be that a tenant, by the mere act of renewing his lease without reserving the right of removal, shall forfeit to his landlord those trade fixtures which are an essential part of his plant, the very property for which he leased the premises to house. The technicalities which inhere throughout the law of landlord and tenant are not always well understood by lawyers without thoughtful investigation, much less by laymen, who are too frequently the victims of their severe application. While every person is presumed to know the law, everyone knows that the average tenant is not advised as to his rights concerning this matter when he enters into a new lease. This being true, why should the courts adhere to the broad application of a rule that serves to transfer the property of one man to another without compensation, when the parties are acting in the utmost good faith without a thought on the subject at the time the new lease is entered into? Whatever reasoning may be put forward in support of the doctrine, in so far as it applies to such things as become a part of the realty and may not be removed without substantial injury thereto, we see none to support it as against the trade fixtures of a tenant which are essentially a part of its plant. We conclude, therefore, that the distinction above pointed out should be observed in this jurisdiction, and that the tenant in the instant case did not abandon the engine, boiler, steam pump and blow-off tank by entering into a new

lease without reserving the right therein to remove them.

But it is argued that, though such be a proper application of the rule to the ordinary lease, in this case there is an express covenant on the part of the tenant to deliver to the landlord the possession of "all fixtures" on the premises, and this covenant alone includes and covers the engine, boiler, steam pump and blow-off tank, even if they are trade fixtures and a part of the tenant's plant. That portion of the lease referred to is as follows: "Said lessee will quit and deliver up the possession of said premises to lessors, their heirs or assigns, when this lease terminates by limitation or forfeiture, with all keys, locks, bolts, window fastenings, all fixtures, and window glass replaced, if broken, in as good order and condition as the same are now, or may hereafter be made by repair, save only the wear thereof from reasonable and careful use." From the context of the words "all fixtures," it would seem that the parties contemplated the surrendering up only of such things as were parcel of the realty, for it is employed in connection with the words, "keys, locks, bolts, window fastenings and window glass replaced" by the tenant, etc. The rule *ejusdem generis* for the construction of instruments obtains and is to be applied here. However this may be, unless it is manifest that the parties intended the words "all fixtures" should cover and include mere trade fixtures as well, it must be understood that they used the words in the sense which the law annexes to them. Our Supreme Court has expressly determined the meaning of the word "fixtures" in this State. The court says that word is "now used in this State to describe a chattel which has become so annexed to the freehold as to become a part of it and cannot be removed without the owner's consent." [Brown v. Baldwin, 121 Mo. 126, 134, 25 S. W. 863.] It appears from the finding of the referee that the engine, boiler,

steam pump and blow-off tank were not so annexed to the building as to render them irremovable without the owner's consent, for, besides these articles being a part of the plant, it is expressly found that they could be removed without material damage to the premises. We concur in the view of the referee that the covenant which required the tenant to surrender up "all fixtures" included those articles only which the tenant so annexed to the property as to preclude their removal without substantial injury to the building—that is, the heating plant and the sprinkling apparatus. The Supreme Court of Tennessee interpreted a like covenant in a lease with respect to rendering up fixtures as we have here. It declared that the word "fixtures" should not apply to mere trade fixtures but rather to such as became parcel of the realty only. [See Cubbins v. Ayres, 4 Lea (Tenn.), 329, 72 Tenn. 329.] We, therefore, conclude that, notwithstanding the provision of the lease above quoted, the engine, boiler, steam pump and blow-off tank continued to be the property of the tenant, with the right of removal during the term.

It is urged on the part of defendants that the judgment should be reversed for the reason the referee received, over their objection and exception, certain incompetent evidence pertaining to the value of the property involved. But we are not persuaded this error was harmful to defendants. Though some evidence on the question of values may have been received that should have been excluded, it is obvious that the referee was not influenced thereby. No one can read the record and study the report of the referee without being convinced that the whole matter was conscientiously sifted by him and only competent and material evidence considered on the final award. Under the statute (Sec. 1850, R. S. 1909) it is the duty of the court to disregard any error committed in any stage of the action which shall not affect the substantial

rights of the adverse party. By section 2082 Revised Statutes 1909, we are commanded that no judgment should be reversed unless the court shall believe error was committed against the appellant materially affecting the merits of the action. We do not believe the error in receiving this testimony materially affected the merits of the action or impinged the rights of defendants, for the entire report of the referee suggests the contrary.

To the end that the proper measure of damages may be applied touching the engine, boiler, steam pump and blow-off tank, which it appears were converted by defendants, the judgment should be reversed and the cause remanded. It is so ordered. *Reynolds, P. J.,* and *Caulfield, J.,* concur.